Gregory C. Black
CORETTE BLACK CARLSON & MICKELSON
129 West Park Street, Suite 301
P.O. Box 509
Butte, Montana 59703
Telephone: (406) 782-5800
Facsimile: (406) 723-8919
Email: gcblack@cpklawmt.com

Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

|  |  |  |
|---|---|---|
| | * | **Cause No. CV 14-63-BMM** |
| THE CHIPPEWA CREE TRIBE OF THE ROCKY BOY'S RESERVATION OF MONTANA, PLAIN GREEN, LLC, and FIRST AMERICAN CAPITAL RESOURCES, LLC, | * * * * * | |
| Plaintiffs, | * * | **DEFENDANTS' PRELIMINARY PRETRIAL STATEMENT** |
| v. | * * | |
| ZACHARY ROBERTS, RICHARD LEE BROOME, GORDON JONES, and MARTIN MAZZARA, in their individual capacities, and DESTEL LLC, FRESH START MARKETING, LLC, and ENCORE SERVICES, LLC, | * * * * * * | |
| Defendants. | * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**1 - DEFENDANTS' PRELIMINARY PRETRIAL STATEMENT**

Defendants, Zachary Roberts, Richard Lee Broome, Gordon Jones, and Martin Mazzara, individually, and DesTel LLC, Fresh Start Marketing, LLC, and Encore Services, LLC submit their Preliminary Pretrial Statement pursuant to this Court's Scheduling Order dated December 9, 2015 (Doc. 29) and Local Rule 16.2(b)(1).

## 1. <u>BRIEF FACTUAL OUTLINE OF THE CASE</u>

In 2010 the Chippewa Cree Tribe of the Rocky Boy's Reservation ("Tribe") made an unsuccessful effort in the online lending business which earned very little. Hoping to learn from this experience, the Tribe then created a wholly-owned tribal entity called First American Capital Resources, LLC. ("FACR") to form a joint venture with a non-tribal entity called ARM, LLC which would bring the capital and expertise to begin a successful lending business in partnership with the Tribe.

ARM brought in Marty Mazzara ("Mazzara") and Zach Roberts ("Roberts") whose company would provide call center services which would be the hub of the lending operation. Mazzara and Roberts also retained Gordon Jones to manage the call center. In June 2010 Mazzara and Roberts brought in Broome to manage the joint venture.

In September 2010, just prior to the estimated launch date, the ARM principals went silent without explanation or communication, and its participation

and commitment of capital investment was withdrawn without warning, effectively putting the whole venture in jeopardy. At that point the Tribe was stranded without funds for salaries and expenses, and needed someone to take over the launch of the lending operation, including raising capital, providing expertise in the lending business, and overseeing the operations.

Broome formed Encore Services Corporation, LLC ("ESC") and negotiated a Management Agreement with FACR. In October 2010, ESC and the Tribe, through its sole lending entity, FACR, executed the Management Agreement and a mutually beneficial partnership was formed. Under Section 1.4 of the Management Agreement, ESC was granted the exclusive right to develop the Tribe's consumer lending enterprises. This exclusivity was essential to ESC's willingness to partner with the Tribe because it was necessary for ESC to raise capital, provided ESC with a means to insulate its own efforts from bad lending partners (the Tribe had previous bad experiences and had been unpaid in an earlier partnership) and a level of confidence necessary to raise capital from investors, and was important in the development of a long-term business relationship. The Management Agreement provided a profit split of 60% to the Tribe and 40% to

ESC, based upon the belief of the Tribe's outside counsel that this was the maximum percentage allowed under federal law[1].

From October 2010 until March 2011, ESC worked with FACR's tribally-appointed officers, CEO Neal Rosette, Sr. and COO Billi Anne Morsette, to build the foundation for an online lending portfolio that would provide long-term, established growth. ESC provided expertise on a range of infrastructural efforts designed to prepare the Tribe for the business demands of running an online lending portfolio. ESC also worked with Rosette, Morsette and others to train staff, introduce business processes, and develop a secure IT network, data security, and internet service strategy. ESC also provided detailed materials on corporate compliance, budgeting process, and accounting architecture.

Broome formed DesTel, LLC on January 5, 2011 to provide the necessary call center services to the Tribe and ESC.

The loss of ARM's seed capital and difficulties raising new capital delayed the launch by approximately 6 months to May 2011. The Tribe had no funding for salaries for appointed officers and looked to ESC to provide this. ESC initially provided $200,000 from its own resources and later borrowed additional funds from a private party for monthly funding for FACR officers' salaries, office

---

[1] ESC originally proposed receiving 49% of the profits. Kovash later determined that he was in error on the maximum percentage, and the parties negotiated an Amended Management Agreement dated April 14, 2011.

**4 - DEFENDANTS' PRELIMINARY PRETRIAL STATEMENT**

expenses, phone service, website, and other expenses. The private lender was later repaid with agreed interest. Roberts created Encore Acceptance I LLC ("EA1") and began raising money for the Tribe's online lending portfolio through that entity. This included raising money as EA1 as well as introducing an investment group out of Utah who ultimately invested directly with the Tribe's FACR ONE, LLC online lending entity.

In March 2011 the Tribe was approached by Think Finance, a Texas-based lender with a stranded portfolio of consumer loans was seeking a federally recognized tribe with 'sovereign entity' status with whom it could quickly partner. The Think Finance portfolio had ceased originating new loans or servicing existing loans as a result of legal action by the Texas Attorney General, and was seeking a partnership with a tribe to transfer its loan portfolio to avoid the reach of the Texas Attorney General's cease and desist order.

Think Finance delivered a proposal to the Chippewa Cree Tribe, offering to partner with the Tribe. This proposal included a term sheet and four supplementary agreements, and Think Finance required that the term sheet and agreements be executed within 30 days.

The Tribe turned to ESC for urgent assistance in evaluating the proposal with only 8 days left before the decision deadline. If the Tribe were going to

pursue the Think Finance proposal, first an agreement addressing ESC's exclusivity needed to be reached and, then a business review of the terms of the Think Finance proposal had to be accomplished quickly. These matters were discussed in a March 10, 2011 telephone conference call between Tribal Chairman Jake Parker and ESC, DesTel, and EA1 representatives. ESC, DesTel and EA1 representatives agreed to review the proposal and to provide business advice to the Tribe and to develop systems to monitor Think Finance's reporting and the revenue data which would be received from Think Finance.

Parker stated on the record that reasonable compensation would be paid for the expertise and advice ESC provided to the Tribe on the Think Finance proposal. As part of that discussion ESC also agreed that it would provide a limited waiver of its exclusivity rights and receive the normal 49% (40% under the Management Agreement, but renegotiated and changed in April) split under the Management Agreement if the Think Finance proposal were consummated. Based upon this phone conference and agreement in principle, the Tribe's outside counsel, Robin Kovash, sent the Think Finance proposal documents to Lee Broome, and ESC immediately began its review.

The following day, after ESC reviewed the details of the proposal, including pro formas and projections provided by Think Finance, ESC proposed a consulting

fee of an initial $15,000 and 10% of the gross monthly revenues which the Tribe would receive under the Think Finance proposal if it were consummated. Based on the proformas provided by Think Finance the 10% would equate to approximately $10,000 per month which all parties agreed was reasonable. These terms were memorialized in a memorandum which ESC sent to tribal representatives, including Rosette, Parker, Kovash, and John "Chance" Houle, Chairman of the Board of FACR and Vice-Chairman of the Tribe. These terms were later formalized in the June 1, 2011 Fee Agreement.

ESC halted all its work, including developing its own FACR loan portfolio, to concentrate on doing extensive due diligence and evaluation of the Think Finance proposal materials. ESC conducted industry research on Think Finance to determine whether it would be a good partner for the Tribe, managed an in-depth review of the various proposed agreements, developed business flow diagrams from the proposed contracts, and assessed the risks associated with the business model, expenses, fees and cash flow for the proposed joint venture, talked with executives at Think Finance and its attorneys at Pepper Hamilton regarding many business and legal issues related to the proposed business.

ESC had concerns about the risks associated with the Think Finance proposal and noted that the Think Finance proposal of 4.5% of profits and a 1%

ownership interest to the proposed tribal lending entity, Plain Green, was less than FACR's profit percentage under its Management Agreement with ESC. Several meetings were held between ESC and Kovash and Rick Eckman of Pepper Hamilton, special counsel to the Tribe whose fees were being paid by Think Finance. Following those meetings, and after ESC conducted further research, ESC advised the Tribe to accept the proposal and that ESC would provide an exception to its lending exclusivity rights for the Think Finance (Plain Green) lending transaction. The Tribe and Think Finance signed agreements, and Plain Green commenced its operations.

Encore Services began to perform in its advisory capacity and ESC resumed efforts to develop the FACR portfolio. Shortly thereafter, the Tribe and Encore Services sought to memorialize the terms of the Fee Agreement in a written contract based upon their prior agreements and course of dealing that had developed in the preceding months. The terms of the Fee Agreement were discussed in Tribal Council meetings in April and May. Encore Services was formed on May 26, 2011 to separate this consulting work from ESC's duties in launching and running the FACR portfolio under the Management Agreement.

In May 2011, after months of effort and cooperation between ESC and FACR, the first FACR portfolio (FACR ONE) was launched.

DesTel had entered into the Master Service Agreement dated January 4, 2011 (signed January 6, 2011) with FACR ONE, LLC, the entity created by the Tribe to actually conduct FACR lending operations. Under that agreement DesTel provided an integrated call center and customer management services, including sub-prime credit reporting, borrower interviews, information verification, loan decision analytics, and a recommendation to the tribe for funding (if applicable) for the loan portfolio.

The successful launch of the FACR portfolio was overshadowed by extensive internal unrest at the Tribe, including the May 23 resignation of the Tribal Chairman Parker due to his indictment for misappropriation of funds, and the potential departure of FACR/Plain Green executives Neil Rosette and Billi Anne Morsette to pursue their own competing online lending ventures with other tribes. Rosette and Morsette started a separate company with Kovash to do consulting work with other tribes. With both FACR and Plain Green in their infancy and the political uncertainty created by Parker's resignation, the Tribe sought a way to prevent Rosette and Morsette from leaving their officer positions to pursue this outside consulting work.

The Tribe asked Encore's advice and assistance to develop an executive bonus package in an effort to entice Rosette and Morsette to forego their

partnership positions in the consulting company and stay with FACR and Plain Green. On June 17, 2011 Encore presented its proposal at an FACR board meeting. The Proposed Joint Venture Proposal set forth two revenue-sharing scenarios - one external (for consulting services performed for other sovereign lending entities) and the other internal (providing for revenue sharing with the Tribe's own lending entities). The internal revenue sharing proposal suggested that a fair executive compensation package would include 2.5% of the monthly profits of Plain Green and FACR paid each to Rosette and Morsette.

As reflected in the meeting minutes, the Proposed Joint Venture was approved by a motion of Tony Belcourt, seconded by Ted Whitford, with all board members in favor. Belcourt requested the addition of signature lines and the creation of a services contract, and that is what occurred. Signature lines were added and the proposal was executed with signatures dated June 17, 2011. Thereafter, a services contract, the Joint Venture Agreement, also dated June 17, 2011 was created and executed, although that was done at a later date but made effective as of June 17, 2011. As a result, Rosette and Morsette stayed in their positions for FACR and Plain Green rather than leave.

Since their agreement in principle in March 2011, the parties had performed under the fundamental terms of the Fee Agreement. ESC gave its consideration

early by not enforcing its exclusivity rights, paving the way for the Tribe's deal with Think Finance. ESC also provided advisory services on the Plain Green portfolio by building out a complex tracking spreadsheet which estimated final revenues, thus giving the Tribe an independent basis of verification for the financial reports from Think Finance. In return, the Tribe paid Encore Services 10% of Plain Green's monthly revenues in April, May, and June of 2011.

By June, when the parties sought to memorialize these terms, the Tribe asked Encore Services to include the additional executive compensation for Rosette and Morsette in the Fee Agreement distribution. Therefore, the terms of the Fee Agreement were drafted to include the additional 5% distribution to them for a total of 15%.

The Fee Agreement, dated June 1, 2011, was agreed to by the parties after negotiations, approved by the Boards of Directors, and duly signed by John Chance Houle, Chairman of the FACR/Plain Green Board of Directors. Far from being hidden, Ted Whitford, the current FACR/Plain Green Board Chairman, Houle, former FACR/Plain Green Board Chairman, and Tony Belcourt and Donovan Stump, FACR/Plain Green Board members, had direct knowledge of the Fee Agreement and an understanding of its terms. The Fee Agreement was

publicized in an article in the October 2011 issue of the Rocky Boy tribal newsletter.

The parties performed under the contracts for two years. The parties did this despite profits from the Plain Green portfolio far exceeding anyone's projections. The initial pro forma had estimated tribal profits after the first fiscal year of $1.6 million, but the Tribe actually received nearly $4 million. By December 2012, the Tribe had received more than $13 million, 15% of which the Tribe paid to Encore Services under the Fee Agreement and the Joint Venture Agreement. Encore Services performed its contractual obligations, providing monthly reports of estimated revenue to the tribe, communicating with Think Finance to pave the way diplomatically for the overdue payment of the 1% portfolio compensation due to the Tribe, and managing invoices to Plain Green for 15% of the gross revenue. Encore Services paid 1/3 of that distribution to Ideal Consulting, an entity identified by Rosette and Morsette to receive those payments.

The year 2013 brought significant changes in tribal leadership, particularly the Business Committee. Ken Blatt St. Marks defeated Ted Whitford in a general election for Tribal Chairman in November 2012. In March 2013, the Business Committee wrongfully removed St. Marks from that position because he was a whistleblower participating with the federal government investigators regarding

widespread corruption at the Tribe, improperly appointing Vice-Chairman Rick Morsette as Acting Chairman and Whitford as Acting Vice-Chairman. Additionally, the FACR/Plain Green board underwent an almost complete turnover in membership. One month after Chairman Blatt St. Mark's wrongful removal, the FACR/Plain Green Board held a reorganization meeting and, as a result, Whitford became the new Board Chairman despite the large number of Tribal members who did not support Whitford in the recent election.

Immediately thereafter, the Board decided to form a Special Committee to investigate ESC and Encore Services. The Pepper Hamilton law firm, which had previously served as special counsel to Plain Green during the Think Finance deal negotiations (appointed by and paid for by Think Finance), served as counsel to the Special Committee and, at Pepper Hamilton's direction, Charles River Associates was hired as a forensic accounting consultant. The "investigation" culminated in a July 2013 letter to Zach Roberts, unilaterally and improperly "terminating" the Management Agreement and the Fee Agreement and demanding payment of more than $10,000,000. This letter came only a few months after Encore Services was able to secure an overdue payment of $1,200,000 for the Tribe from Think Finance on its 1% obligation to the Tribe.

This purported termination placed ESC in a position of needing to mitigate the damages caused by these actions. Pepper Hamilton's rush to improperly cancel the contracts coincided with an unexpected cessation of ACH services, a result of the Department of Justice's "Operation Chokepoint." The Tribe refused to respond to urgent requests, emails and phone calls from ESC, to complete new ACH applications so that payments on millions of dollars of the short-term loans by FACR ONE could be collected from borrowers. The Tribe's determination not to respond left the entire portfolio stranded and the majority of the loan portfolio unable to be collected as per contract with the thousands of borrowers.

ESC and EA1 acted in the best interests of the secured noteholding creditors in the loan portfolio in mitigating the negligent actions of the tribe and their counsel and exercising all efforts to recoup as much as possible to mitigate the losses from a complete portfolio collapse. Unfortunately most of the value of the FACR portfolio was lost due to a failure of the Tribe to execute necessary payment processing applications, which could have been easily completed by the Tribe, but not by ESC because those applications required signatures from a FACR ONE Board member. Both ESC and EA1 ultimately filed for bankruptcy as a result on May 27, 2014 in the United States Bankruptcy Court for the District of Nevada.

Encore filed a Demand for Arbitration against the Tribe, FACR, and Plain Green with the American Arbitration Association on September 18, 2013 concerning the termination of the Fee Agreement. The Tribe, FACR, and Plain Green counterclaimed that the Fee Agreement and associated Joint Venture Agreement was procured by fraud and sought to void that agreement and recover damages. The Tribe and its entities alleged fraud, civil conspiracy, intentional and negligent misrepresentation, breach of fiduciary duties, negligence, unjust enrichment, and conversion against Encore. They claimed damages of $13,102,302.99, the same amount claimed against defendants in this case. This claim included amounts paid by FACR to DesTel, LLC and Fresh Start Marketing, LLC. Doc. 1-1, pp. 17-18. After limited discovery, an arbitration hearing was held in Las Vegas on March 10-13, 2014.

A Final Award from the arbitration was entered on July 13, 2014. Doc. 1-1. The arbitrator ruled that the Fee Agreement giving Encore 15% of Plain Green's revenue, out of which Encore paid 5% of that revenue to Rosette and Morsette under the Joint Venture Agreement, was procured by fraud and misrepresentation as it related to the money paid to Rosette and Morsette. The arbitrator ruled against Encore on the claims of fraud, civil conspiracy, intentional misrepresentation, negligent misrepresentation, breach of fiduciary duty, and

negligence on the same basis.  Doc. 1-1, pp. 14-17.  The arbitrator ruled against the Tribe, FACR, and Plain Green on their theories of unjust enrichment and conversion.  Doc. 1-1, p.17.  The arbitrator rejected the claim for $13.1 million, and awarded $1,181,128.79 which was the 5% amount passed on by Encore to Rosette and Morsette, plus costs and attorney fees.  Doc. 1-1, p. 19.  The arbitrator did not award damages for the 10% earned by Encore Services under the Fee Agreement.  The arbitrator awarded no damages for FACR's claims against DesTel and Fresh Start Marketing, even though the Tribe and tribal entities put on evidence in an effort to show that Encore-related entities (ESC, DesTel, and Fresh Start Marketing) did not do a good job of managing FACR, either in running the call center or obtaining investors. Doc. 1-1, p.18.

An Application to Confirm the Arbitration Award was filed in the United States District Court for the District of Nevada on August 7, 2014.  Encore was served but did not appear.  An Order confirming the arbitration award against Encore and a Judgment based on that Order were filed December 19, 2014.

## 2.  <u>FEDERAL JURISDICTION AND VENUE</u>

Jurisdiction in this Court is based upon diversity of citizenship and requisite amount in controversy under 28 USC §1332.  Venue is proper in this Court under Local Rule 3.2(b).

### 3. <u>FACTUAL AND LEGAL BASIS FOR EACH DEFENSE</u>

### A. Choice of Laws Issues

Plaintiffs' complaint raises issues related to the Management Agreement and Amended Management Agreement, even though ESC is not a defendant in this case. Those agreements have a choice of laws provision requiring that issues of interpretation, validity, and performance of the agreements be governed by "tribal and federal law and by Montana law to the extent not contrary to Montana law." (¶17).

The Fee Agreement contains a provision that the agreement shall be governed by Nevada law without regard to conflict of law provisions (¶9). The Joint Venture Agreement contains a Governing Law provision requiring "all disputes or controversies arising out of or relating to" the agreement to be governed by or construed according to Montana law (¶1.13).

The Fresh Start Service Agreement is required to be governed, interpreted, construed, and enforced" under Nevada law (¶10.b). The DesTel Services Agreement requires that it be governed by Nevada law (General Provisions, c).

Disputes arising out of or relating to the Fee Agreement, Fresh Start Service Agreement, and DesTel Services Agreement are to be resolved under Nevada law. The issues in the arbitration proceeding, discussed below, involving tort claims

arising out of these agreements, as well as the Management Agreement and Amended Management Agreement, were decided under Nevada law.  Doc. 1-1.

Defendants contend Nevada law should apply to this case.

To the extent this Court must decide what law applies, a federal court sitting in a diversity case applies the law of the forum state to choice of law rules. *Johnson v. Wells Fargo Home Mortgage, Inc.,* 635 F.3d 401, 420, n. 16 (9th Cir. 2011).  Montana's choice of law rules are articulated in *Moodroo v. Nationwide Mut. Fire Ins. Co., Inc.,* 2008 MT 275, ¶54, 345 Mont. 262, 191 P.3d 389.  Under those rules, the choice of laws agreed to by the parties will apply unless three factors are met: (1) if, but for the choice-of-law provision, Montana law would apply under §188 of the *Restatement (Second) of Conflict of Laws;* (2) if Montana has a materially greater interest in the particular issue than the state chosen by the parties; and (3) if applying the state law chosen by the parties would contravene a fundamental policy of Montana.

## B.    Issues Arising from Arbitration Proceedings

The confirmation of the July 31, 2014 Final Award entered by Arbitrator Patrick Irvine by the United States District Court in Nevada on December 19, 2014, and entry of Judgment on that Order raise issues of res judicata and collateral estoppel in this case.

A judgment entered on an arbitration award has the same effect as a judgment entered after court litigation.  9 U.S.C. §13.

## 1.    Res Judicata Bars Plaintiffs' Claims Against Encore Services and the Other Defendants

Res judicata, or claims preclusion, bars parties from relitigating claims where they already had an opportunity to litigate those claims and prevents parties from splitting their causes of action. It applies where the parties or their privies are the same, the subject matter of the claim is the same, the issues are the same and relate to the same subject matter, and the capacities of the persons are the same in reference to the subject matter and the issues.  It applies once a final judgment on the merits has been entered. *Horvath v. Gladstone,* 97 Nev. 594, 597, 637 P.2d 531, 533 (1981).   Montana law is the same.  *Touris v. Flathead County,* 2011 MT 165, ¶¶12-13, 361 Mont. 172, 258 P.3d 1.

Here, the Tribe, FACR, and Plain Green were the respondents and counterclaimants in the Nevada arbitration, litigated (or could have litigated) the same issues and asserted the same damage claims against Encore Services which they now are asserting (again) against Encore Services and the individual defendants.   They are asserting the same claims, raising the same issues, and claiming the same damages ($13,102,302.99) they sought in arbitration, even

though the arbitrator awarded them less than 10% of that amounts. Res judicata bars plaintiffs from relitigating those issues and claims against Encore Services.

Res judicata also bars plaintiffs' claims against the individual defendants to the extent they seek damages greater than those awarded in the arbitration proceeding. The individual defendants in this case are claimed to be the principals of Encore Services, thus they are in privity with Encore Services for purposes of this res judicata analysis. Plaintiffs cannot now relitigate their claims which were unsuccessful in arbitration with Encore Services against the individual defendants.

The same is true of the claims asserted against Fresh Start and DesTel. Although those entities were not named as parties in the arbitration counterclaim, claims were asserted that they were "Encore-related entities," and the damages sought by the Tribe, FARC, and Plain Green on their counterclaim included all sums paid to Fresh Start and DesTel. Doc. 1-1, p.18. Those damage claims involving Fresh Start and DesTel were rejected by the arbitrator. Thus, Fresh Start and DesTel are privies of Encore Services for res judicata purposes. Those entities are alleged in the complaint to be part of "one enterprise," all "companies controlled by the Individual Defendants." Doc. 1-1, ¶¶37, 47.

### 2. The Claims Against Defendants Are Barred by Collateral Estoppel

To the extent that plaintiffs' effort to relitigate claims they previously had an opportunity to litigate is not barred by res judicata, plaintiffs are barred from relitigating issues which were litigated and decided in the arbitration against Encore Services and its privies under the doctrine of collateral estoppel. Collateral estoppel applies where it is established that (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated, (2) the first proceeding ended with a final judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding. *Kahn v. Morse & Mowbray,* 121 Nev. 464, 474, 117 P.3d 227, 235. Montana law has the additional requirement that the party against whom collateral estoppel is sought to be asserted must have had a full and fair opportunity to litigate the issue to invoke collateral estoppel. *Baltrush v. Baltrush,* 2006 MT 51, ¶¶17-18, 331 Mont. 281, 130 P.3d 1267.

The issues raised in this complaint were raised and litigated in the arbitration proceeding, and plaintiffs are precluded from raising them again in this case against Encore Services and its privies. As explained above, the individual defendants, Fresh Start, and DesTel are privies of Encore Services for application of collateral estoppel.

### 3. If Res Judicata or Collateral Estoppel Do Not Apply, the Arbitration Award is Not Admissible in Evidence and is Not Binding on Defendants Other than Encore Services

In the event a determination is made that res judicata or collateral estoppel do not apply, then the arbitration award is not binding on the non-Encore Services defendants, and they are entitled to raise all defenses and issues available to them in light of plaintiff's claims.

The arbitration award itself is not admissible in evidence, nor may it be considered by the jury. The award is inadmissible hearsay under Rules 801 and 802, Federal Rules of Evidence. *United States v. Sine,* 493 F.3d 1021, 1036 (9th Cir. 2007)(judicial findings are hearsay, inadmissible to prove the truth of the findings unless a specific hearsay exception exists). Even if admissible, its prejudicial effects outweigh any probative value under Rule 403, F.R.Evid. The award was made by an arbitrator, and admission of the factual and legal determinations by that arbitrator would pose a significant risk that a jury would give those determinations undue weight, creating a danger of undue prejudice.

### C. Alter Ego Theory Against Individual Defendants

Plaintiffs seek to impose liability upon the individual defendants under an alter ego theory by piercing the "veil" of limited liability companies.

The limited liability companies sued in this case were all formed under the laws of Nevada. Those LLCs were headquartered there, and their primary operations relating to the agreements at issue were performed in Nevada. The laws of Nevada, the state of LLC formation (or incorporation in the case of a corporation) should apply to the piercing and alter ego claims in this case. See, e.g., *Fletcher v. Atex., Inc.,* 68 F.3d 1451, 1457 (2nd Cir. 1995).

Under Nevada law, piercing of the corporate veil can occur when the following is shown: (1) the corporation must be influenced and governed by the person asserted to be its alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice. *Lorenz v. Beltio, Ltd.,* 114 Nev. 795, 807, 963 P.2d 488, 496 (1998); *Ecklund v. Nevada Wholesale Lumber Co.,* 93 Nev. 196, 197, 562 P.2d 479, 479–80 (1977).

### D.    Dissolution of Encore Services

Encore Services was voluntarily dissolved on August 21, 2014. Under N.R.S. 86.505, that dissolution does not affect this lawsuit, as dissolved LLCs continue as companies for the purpose of defending litigation. *Karter v. Sunvest Communities USA, LLC*, 2012 WL 6800636 *3 (D. Nev. 2012).

### E. Bankruptcy of ESC and EA1

The fact that there are ongoing Chapter 11 bankruptcy proceedings involving ESC and EA1 may have a bearing on the handling of issues in this case. ESC was the party to the Management Agreement and Amended Management Agreement. The complaint references those agreements in several portions of the complaint (Doc. 1-1, ¶¶31-33, 38-47, 56-57, 93a, 110-14, 116, 124a, 125a, 2(sic), 4(sic)), generally relating to ESC's exclusivity rights contained in those agreements and management of the FACR loan business. In fact, allegations are improperly made directly about ESC in this action. Doc. 1-1, ¶114. The Nevada bankruptcy court has jurisdiction over issues between the Tribe and ESC relating to those agreements, absent a lifting of the automatic stay, 11 U.S.C. §362.

The Tribe filed a Proof of Claim in those (now consolidated) bankruptcy cases in the same amount of the claim in this case - $13,102,302.99.

### F. Fiduciary Duty Allegations

Plaintiffs allege that fiduciary duties arose from the Management Agreement and Fee Agreements. Fiduciary duties do not arise in ordinary contract relationships. They can arise in situations in confidential relationships where one party puts it faith and trust in another party to act in its best interests. *Perry v. Jordan,* 111 Nev. 943, 947, 900 P.2d 335, 337-38 (1995). Whether a fiduciary

duty exists in a relationship is a question of fact. *Yerington Ford, Inc. v. General Motors Accept. Corp.,* 359 F.Supp.2d 1078, 1088 (D. Nev. 2004).

### G. Encore Service's Performance and the Tribe's Waiver/Estoppel

Encore Services performed its services for the Tribe's lending entities under the Fee Agreement for over 2 years, and was paid the monthly fees owed it, before the Tribe gave notice of termination of the Fee Agreement. Having accepted that performance and compensated Encore Services for that performance with the knowledge of its officials, the Tribe is estopped and has waived its right to seek repayment of money for those services.

## 4. COMPUTATION OF DAMAGES

Defendants do not seek damages in this matter.

## 5. ANY RELATED STATE OR FEDERAL LITIGATION

The Tribe, Plain Green, LLC and FACR filed an action against Encore Services, LLC in the United States District Court for the District of Nevada, Cause No. CB-01294 seeking to confirm the arbitration award in Case No. 79-148-Y-00018-13, American Arbitration Association.

ECS and Encore Acceptance filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Nevada on May 27, 2014. Those cases are not closed.

**6.     ADDITIONAL STIPULATIONS OF FACT AND APPLICABLE LAW**

Defendants do not propose additional stipulations of fact beyond the State of Stipulated Fact submitted by the parties.  As for determining the applicable law in this case,   see the discussion of applicable law in Section 3 above.

**7.     PROPOSED DEADLINE FOR JOINDER OF PARTIES OR AMENDMENT OF THE PLEADINGS**

As reflected in the Joint Discovery Plan filed by the parties, this proposed deadline is to be determined at the Preliminary Pretrial Conference.

**8.     CONTROLLING ISSUES OF LAW SUITABLE FOR PRETRIAL DISPOSITION**

Defendants intend to move for summary judgment on the res judicata/ collateral estoppel issues.  To the extent necessary, defendants will file a motion to determine whether Montana law or Nevada law applies to certain issues in the case.

**9.     IDENTIFICATION OF PERSONS WITH INFORMATION**

1.     Billi Anne Morsette – a former Chief Executive Officer and COO of Plain Green and FACR. She is expected to testify consistent with the sworn testimony given during her deposition for the arbitration proceeding.  She has personal knowledge about the structure, authority, and payments of money paid to Ideal by Encore Services as well other agreements between plaintiff and defendant

entities.

2.      Neal Rosette Sr. – a former Chief Executive Officer of Plain Green and FACR.  He is expected to testify consistent with the sworn testimony given during his deposition for the arbitration proceeding.  He has personal knowledge about the structure, authority, and payments of money paid to Ideal by Encore Services as well other agreements between plaintiff and defendant entities.

3.      Jake Parker – was Chairman of the Tribe's Business Committee at the time of the formation of FACR and at the time of the proposal for a joint venture by Think Finance, the request by the Tribe for the assistance of the Encore team in the assessment of the Think Finance proposal, and subsequent monitoring of the Think Finance joint venture (Plain Green) activity.

4.      Joel Rosette – former Chief Executive Officer of FACR and Chief Executive Officer of Plain Green.  Likely has knowledge of Tribal entity interactions with defendants.

5.      LeAnn Montes – Attorney General of the Tribe.  Likely has knowledge of Tribal entity interactions with defendant entities.

6.      Ted Whitford – a member of the Tribal Business Committee and is a member of the board of directors of FACR and Plain Green.  Likely has knowledge of Tribal entity interactions with defendant entities.

7. Rick Morsette – current Acting Chairman of the Tribal Business Committee. Likely has knowledge of Tribal entity interactions with defendant entities.

8. Tim McInerney – was brought in by the Tribe as Business Manager/Finance Director in 2012 to assist in organizing the finances of various tribal entities and agencies. He was appointed to the board of directors of Plain Green and FACR. Likely has knowledge of Tribal entity interactions with defendant entities.

9. John "Chance" Houle - was a member of the Tribal Business Committee and was Chairman of the board of directors of Plain Green and FACR. He has knowledge about the agreements between defendant entities and Tribal entities and with Ideal Consulting and interactions among those entities.

10. Donovan Stump - was a member of the board of directors of Plain Green and FACR with knowledge about the agreements between those entities and defendant entities and with Ideal Consulting and interactions among those entities.

11. Joseph Laframboise, Jr. – was a Plain Green and FACR board member with knowledge about the agreements between those entities and defendant entities and interactions among those entities.

12. Tony Belcourt - was a board member of Plain Green and FACR

with knowledge about the agreements between those entities and defendant entities and with Ideal Consulting and interactions among those entities.

13.     Ken Marks St Blatt - is Chairman of the Tribal Business Committee.  He has knowledge regarding Fee Agreement and Joint Venture Agreement at issue in this case.

14.     Neal Rosette, Jr. – has knowledge of the agreements and working relationship between defendant entities and their agents and FACR and Plain Green and the efforts provided by defendant entities to fulfill their duties.

15.     Bobbi Jo Favel - has knowledge of the agreements and working relationship between and among defendant entities and FACR and Plain Green and the efforts provided by defendant entities to fulfill their duties.

16.     Jeff Matthews – is Vice President of Charles River Associates and has knowledge about his review and audit of FACR and Plain Green information gathering and reports created for the Tribe.

17.     Nicole LaMere - has knowledge of the agreements and working relationship between and among defendant entities and FACR and Plain Green and the efforts provided by defendant entities to fulfill their duties.

The above persons are Tribal members or connected with the Tribe which should know their contact information.

18.     Robin Kovash - 1999 Broadway, Denver, Colorado 80202; (303)573-1600 – outside counsel to the Tribe, FAAR, and FACR when those companies were being established.  Has knowledge of contracts Tribal entities entered into with defendant entities, as well as Ideal Consulting and Think Finance.

19.     Daniel D. Belcourt, 123 Woodworth Ave., Missoula, Montana 59801; (406)265-0934  - was outside counsel to the Tribe, FAAR, and FACR. He also has knowledge about many of the agreements and contracts between Tribal entities and defendant entities.  Has knowledge about Neal Rosette's severance agreement.

20.     Dr. James Eastlick, address unknown – was one of the managers of the Tribe's health clinic and a member of Ideal Consulting.

21.     Steve Bingham, 1241 N. Main St., Layton, Utah 84041 – principal in Capline Micro Lending Fund.  Has knowledge about the Amended Management Agreement and loans made by Capline to FACR ONE, LLC.

22.     Matt Youngman, McGladrey & Pullen, LLP, 300 S. 4th St., Las Vegas, Nevana 89101; (702)759-4000 – Has knowledge about Charles River audit and involvement of some defendants in that process.  Other members of the McGladrey audit team who may have knowledge are Julie Fox, Adam French,

and Drew Gibson.

23. Mike Freidl, 3002 Dow Ave., Ste. 132, Tustin, California 92780 – hired by Tribal entities as a consultant in connection with lending enterprise.

24. Zachary Roberts. May be contacted through his counsel – Has knowledge of the involvement of defendant entities and Encore Service Corporation with Tribal entities.

25. Martin Mazzara. May be contacted through his counsel - Has knowledge of the involvement of defendant entities and Encore Service Corporation with Tribal entities.

26. Lee Broome. May be contacted through his counsel – Has knowledge of the involvement of defendant entities and Encore Service Corporation with Tribal entities.

27. Gordon Jones. May be contacted through his counsel - Has knowledge of the involvement of DesTel, LLC with Tribal entities.

28. Think Finance personnel, 4150 International Plaza, FortWorth, Texas; (817)546-2700 – Those persons include Ken Rees, Martin Wong, Jason Harvison, Sarah Cutrona, Chris Lutes, Michelle Nguyen, and Linda Callnin. Encore Services consulted with the Tribe about its proposed agreement with Think Finance, then

monitored financial information once an agreement was made between Think Finance and Plain Green.

29.    Fawn Hahn Tadios, address unknown – former CEO of Tribal Health Clinic.  Has knowledge of Dr. Jim Eastlick's position at the clinic.

**10.    INSURANCE AGREEMENT THAT MAY COVER A RESULTING JUDGMENT**

None.

**11.    SETTLEMENT    DISCUSSIONS    AND    PROSPECTS    FOR COMPROMISE**

There have been no settlement discussions, and defendants are unsure of the prospects for compromise.

**12.    SPECIAL PROCEDURES**

Defendants do not believe that any special procedures need to be utilized.

DATED this 27th day of January, 2015.

/s/ Gregory C. Black
CORETTE BLACK CARLSON
        & MICKELSON
Attorneys for Defendants